FILED

2007 Jun-14  PM 04:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARION EUGENE HALL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:06-CV-0393-RDP** |
| | } | |
| **JOE PIPER, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the court is Defendant's Motion for Summary Judgment, filed on December 18, 2006.  (Doc. # 17).  The motion was fully briefed by the parties and is now under submission. For the reasons set forth more fully below, the court finds the motion is due to be denied because Plaintiff's claims are not barred by judicial estoppel and there exists at least one issue of material fact to be determined by the fact-finder.  Therefore, Defendant is not entitled to judgment as a matter of law.

## II.    STATEMENT OF FACTS

Joe Piper ("Piper" or "Defendant") purchases defective paperboard from paper mills and converts it into a useable product at its Birmingham, Alabama facility.  (Doc. # 19 Ex. A at 9).  The converting department has three shifts, and the first shift works from 5:00 a.m. to 1:00 p.m.  (*Id.*; Doc. # 19 Ex. B at 10–11,13).  Bill Mores ("Mores") is the Converting Department Manager and Scott Moncrief ("Moncrief") is the supervisor for the first shift.  (Doc. # 19 Ex. A at 9; Doc. # 19 Ex. B at 10).  Plaintiff is African-American and Moncrief and Mores are Caucasian. (Doc. # 22 Ex. 1 ¶ 3).  Plaintiff was hired at Piper in April 1993 and worked there until he was terminated on

August 22, 2005.  (*Id.* ¶ 2).  Moncrief was also hired at Piper in 1993 and has been a supervisor since August 2002. (Doc. # 19 Ex. B at 10, 19).

### A.     Joe Piper's Attendance Policy.

Piper has in place an Attendance Policy (the "Policy").  (Doc. # 19 Ex. C).  The Policy is a progressive disciplinary system that assigns points for various types of absences.  (*Id.*).  When the Policy went into effect in 2002, all employees received the benefit of a clean slate.  (Doc. # 19 Ex. A at 18–19;  Doc. # 19 Ex. D at 67).  Mores is responsible for maintaining the attendance records and keeping up with the number of attendance points an employee has incurred.  (Doc. # 19 Ex. B at 76; Doc. # 19 Ex. A at 12).  Since its inception, two employees have purportedly been terminated under the Policy, including Plaintiff, who is African-American, and Ken Downey, who is Caucasian. (Doc. # 19 Ex. A at 79–80; Doc. # 19 Ex. E).

### B.     Administration of the Attendance Policy.

Usually on Mondays, Mores receives the time cards from the previous week and tracks employees' absences and tardies by reviewing their time cards.   (Doc. # 19 E. A at 17).  Mores documents an employee's attendance on an attendance calendar.  (Doc. # 19 Ex. F).  Mores relies on the supervisors to tell him whether an employee's absence should be recorded as a sick day, personal day, scheduled vacation day, or unscheduled vacation day. (Doc. # 19 Ex. A at 12–13, 19–20, 60).  Moncrief testified that he has authority to give an employee an attendance point.  (Doc. # 19 Ex. B at 110).

Under the Policy there are certain types of absences that are not assigned points. (Doc. # 19 Ex. C).  These include sick days, personal days, scheduled vacation days, jury duty, bereavement leave, and FMLA leave.  (*Id.*; Doc. # 19 Ex. A at 20).  Additionally, Mores stated that employees

who would otherwise get an attendance point do not get one when emergencies arise regarding their "immediate family." (Doc. # 19 Ex. A at 64–66). "Immediate family" can include extended family, depending on the closeness of the employee's relationship with the relative as assessed by Mores and the employee's supervisor. (*Id.* at 72).

Under the Policy, an employee is assessed one (1) point for being tardy or leaving early and two (2) points for an unscheduled absence. (Doc. # 19 Ex. C). Employees are allowed two (2) personal days per year as well as five (5) sick days per year, and no advance notice is needed to take personal or sick days. (Doc. # 19 Ex. B at 32). The amount of vacation time an employee receives depends on the length of his tenure with Piper. (*Id.* at 56–57). An employee is required to schedule vacation and have it approved ahead of time in order for him miss work without accumulating points under the Policy. (*Id.* at 90–91; Doc. # 19 Ex. D at 78). Moncrief has the authority to give an employee a vacation day. (Doc. # 19 Ex. A at 21; Doc. # 19 Ex. B at 52). Mores told Plaintiff and other employees that they had to arrange days off with Moncrief and report absences to him; however, Mores insists in his testimony that these scheduling matters could also be arranged through any supervisor or through himself. (Doc. # 22 Ex. 1 ¶ 6; Doc. # 19 Ex. A at 13–14, 22, 53). Employees who work under Moncrief schedule vacation days through him by giving at least five (5) days notice. (Doc. # 19 Ex. B at 47). Approximately one (1) month before he was terminated, Plaintiff stated he went to Mores and complained that Moncrief was taking days that he had asked in advance to be vacation days and designating them as sick days. (Doc. # 22 Ex. 1 ¶ 5; Doc. # 19 Ex. D at 82–88). One effect of Moncriefs recording Plaintiff's vacation days as sick days would be to reduce the number of approved days off he had for unplanned absences. (Doc. # 22 Ex. 1 ¶ 5).

3

Under the Policy, if an employee has an unscheduled absence and has unused sick or personal days, he will be assessed either a sick or personal day—not attendance points—and will be paid for the absence.  (Doc. # 19 Ex. B at 22).   Additionally, under the Policy, if an employee has an unscheduled absence and has no personal or sick days remaining for the year, but still has vacation days left, his absence is treated as an unscheduled vacation day.  (*Id.* at 57).   Therefore, he will receive two (2) attendance points for that unscheduled absence but will still get paid because he uses a vacation day.  (*Id.* at 57, 59, 68; Doc. # 19 Ex. D at 78–79).   Finally, the Policy provides that if an employee receives no attendance points for thirty (30) days, he will receive a one (1) point deduction from the total.  (Doc. # 19 Ex. D at 102).   Although the Policy states that an employee is terminated upon accumulating twenty (20) points, Defendant has developed the following practice:   an employee who has accumulated twenty (20) points is given a five (5) day unpaid suspension, but he will be terminated if he reaches twenty-one (21) points.  (Doc. # 19 Ex. A at 73; Doc. # 19 Ex. B at 75).

### C.    Plaintiff's Attendance History and Termination.

Plaintiff worked for Piper as a machine operator in the converting department on the first shift.  (Doc. # 1 ¶¶ 3, 5–7).  Plaintiff was terminated on August 22, 2005, for allegedly violating the Policy.  (*Id.* ¶ 9).  Moncrief told Hall he was terminated a little after 5:00 a.m. on the morning of August 22, 2005.  (Doc. # 22 Ex. 1 at ¶ 9).  Mores had no knowledge of the situation until he got to work later that day when Moncrief told him Plaintiff had not shown up for work and called him.  (Doc. # 19 Ex. A at 53–54).  Mores assumed that Plaintiff had called in to Piper already knowing that he was terminated for excessive attendance points.  (Doc. # 19 Ex. A at 55–56).  Plaintiff was replaced with a Caucasian employee.  (Doc. # 22 Ex. 3).

A summary of Piper's records regarding Plaintiff's attendance for the twelve (12) months prior to his termination reveals the following:

(1)    as of August 22, 2004, Plaintiff carried twelve (12) attendance points;

(2)    on August 23, 2004, Plaintiff took one (1) vacation day;

(3)    on August 24, 2004, Plaintiff was late and accrued one (1) point, bringing him to a total of thirteen (13) points;

(4)    on August 30, 2004, Plaintiff received one (1) day suspension from work;

(5)    on September 24, 2004, Plaintiff took one (1) vacation day, and, Plaintiff having accrued no attendance points in the preceding thirty-day period, one (1) point was subtracted from his total that same day, bringing him to a total of twelve (12) attendance points;

(6)    on October 14, 2004, Plaintiff was absent from work, assessed one (1) unscheduled vacation day and, thus, two (2) attendance points, bringing him to a total of fourteen (14) attendance points;

(7)    on November 10, 2004, Plaintiff was absent from work, assessed one (1) unscheduled vacation day and, thus, two (2) attendance points, bringing him to a total of sixteen (16) attendance points;

(8)    on December 7, 2004, Plaintiff was late to work and assessed one (1) attendance point, bringing him to a total of seventeen (17) attendance points;

(9)    from January 3, 2005 to January 7, 2005, Plaintiff scheduled three (3) vacation days and two (2) personal days, and, Plaintiff having accrued no attendance points in the preceding thirty-day period, one (1) point was subtracted from his total, bringing him to a total of sixteen (16) attendance points;

(10)    on January 19, 2005, Plaintiff took one (1) sick day;

(11)    on January 21, 2005, Plaintiff was late to work and assessed one (1) attendance point, bringing him to a total of seventeen (17) attendance points;

(12)    on January 31, 2005, Plaintiff took one (1) sick day;

(13)    on February 3 & 4, 2005, Plaintiff took two (2) sick days;

(14)    on February 7, 2005, Plaintiff took one (1) scheduled vacation day;

(15)    having accrued no attendance points in the preceding thirty-day period, one (1) point was subtracted from Plaintiff's total on February 21, 2005, bringing him to a total of sixteen (16) attendance points;

(16)    on March 2, 2005, Plaintiff took one (1) sick day;

(17)    on March 8, 2005, Plaintiff took one-half (½) day of scheduled vacation;

(18)    on March 16, 2005, Plaintiff was absent from work, assessed one (1) unscheduled vacation day and, thus, two (2) attendance points, bringing him to a total of eighteen (18) attendance points;

(19)    from March 17, 2005 to March 21, 2005, Plaintiff was suspended from work for three (3) days;

(20)    on April 8, 2005, Plaintiff took one-half (½) a scheduled vacation day;

(21)    having accrued no attendance points in the preceding thirty-day period, one (1) point was subtracted from Plaintiff's total on April 16, 2005, bringing him to a total of seventeen (17) attendance points;

(22)    on April 18 & 27, 2005, Plaintiff took two (2) scheduled vacation days;

(23)    on May 9 & 10, 2005, Plaintiff took two (2) scheduled vacation days;

(24)    on May 13, 2005, Plaintiff was late getting to work, and was assessed one (1) attendance point, bringing his total to eighteen (18) attendance points;

(25)    on May 16, 2005, Plaintiff was late getting to work and was assessed one (1) attendance point, bringing his total to nineteen (19) attendance points;

(26)     Plaintiff having accrued no attendance points in the preceding thirty-day period, one (1) point was subtracted from his total on June 16, 2005, bringing him to a total of eighteen (18) attendance points;

(27)     on July 5, 2005, Plaintiff took one (1) scheduled vacation day;

(28)     Plaintiff having accrued no attendance points in the preceding thirty-day period, one (1) point was subtracted from his total on July 17, 2005, bringing him to a total of seventeen (17) attendance points;

(29)     on July 18, 2005, Plaintiff was absent from work, assessed one (1) unscheduled vacation day and, thus, two (2) attendance points, bringing him to a total of nineteen (19) attendance points;

(30)     on August 5, 2005, Plaintiff was late getting to work, and was assessed one (1) attendance point, bringing his total to twenty (20) attendance points;

(31)     from August 8, 2005 to August 15, 2005, Plaintiff was suspended from work for five (5) days; and

(32)     on August 22, 2005, Plaintiff was late getting to work, was assessed one (1) attendance point, bringing his total to twenty-one (21) attendance points, and he was terminated.

(*Id.* at 36–48; Doc. # 19 Ex. F; Doc. # 19 Ex. D at 22).

Defendant explains, and Plaintiff admits, that, although not recorded on the attendance sheets nor the attendance chart in the record, on August 5, 2005, Plaintiff came to work late and also left work early.  (Doc. # 19 Ex. D at 95–96; Doc. # 19 Ex. B at 108–109).  Defendant argues that although Plaintiff could have been assessed two (2) points that day—for two discrete Policy violations—he was only assessed one (1) attendance point.  (Doc. # 19 Ex. B at 132, 137, 154–55; Doc. # 19 Ex. A at 65–67, 90; Doc. # 19 Ex. D at 95–100).  Mores testified that Plaintiff was assessed the attendance point for leaving early but did not get one for coming in late.  (Doc. # 19 Ex. A at 47).  Plaintiff disputes this, stating that he came in late to work and left work early due to his

cousin, Percy Mims, being in the hospital in Tuscaloosa.  (Doc. # 19 Ex. D at 95–96; Doc. # 22 Ex. 1 ¶ 7).  Plaintiff argues that he should not have gotten an attendance point for leaving early because Mims was "immediate family" as contemplated by Piper's emergency exception to the policy, because, although Mims was his cousin, Plaintiff and Mims grew up together in the same house, Mims is "like a brother to him," and Moncrief and Mores were aware of this relationship, Mims having even visited Hall at work on many occasions.  (Doc. # 22 Ex. 1 ¶ 7).  Further, Plaintiff argues that he should not have gotten a point for leaving early because, in addition to the "immediate family" exception, Moncrief told him that Mores had given Plaintiff permission to leave if he needed to do so for the express purpose of visiting Mims in the Tuscaloosa hospital.  (*Id.*)

August 22, 2005 was Plaintiff's birthday.  (*Id.* ¶ 8).  On that date, Plaintiff missed the start of his scheduled shift.  (Doc. # 19 Ex. D at 103; Doc. # 19 Ex. A at 48).  A fellow employee called him that morning and told him he did not have a vacation day scheduled for that day nor did he have one available to take (which was incorrect) and was expected at work.[1]  (Doc. # 19 Ex. D at 106–08).  After speaking with his co-worker, Plaintiff called Moncrief a little after 5:00 a.m.  (*Id.* at 108–09).  Plaintiff told Moncrief that he (Moncrief) knew that Plaintiff was supposed be off of work for his birthday.  (Doc. # 22 Ex. 1 ¶ 9).  Moncrief told Plaintiff he had no days to take, which was false, and said that they had to let Plaintiff go because he was over the attendance points maximum.[2]  (*Id.*).

---

[1]Plaintiff has testified in his affidavit that on the morning of August 22, 2005, Nate Hall, a co-worker, called Plaintiff and said that Moncrief had said that Plaintiff was supposed to be at work and was not.  (Doc. # 22 Ex. 1 ¶ 9; Doc. # 22 Ex. D at 107–108).  Plaintiff told Nate he was off for his birthday, and Nate said he knew that but that Moncrief said he had not gotten approval for the day off.  (Doc. # 22 Ex. 1 ¶ 9).

[2]During his deposition, Plaintiff never testified that he told Moncrief that he was supposed to be on vacation that day.  To the extent that Defendant contends that Plaintiff's affidavit testimony is inconsistent with his deposition, the court disagrees.  Although Defendant did cover this

Plaintiff claims he did not want to argue with Moncrief, so he told him, "Sarge, it was nice working with you" and hung up the phone.  (*Id.*; Doc. # 19 Ex. D at 103, 107–08; Doc. # 19 Ex. B at 140–41).

Plaintiff claims that he should not have been terminated because he had previously scheduled with Moncrief to take a vacation day on his birthday, August 22, 2005, and that he regularly used vacation days to celebrate his birthday each year.[3]  (Doc. # 22 Ex. 1 ¶¶ 5–6, 9).  In fact, Piper's records filed show that he took off for his birthday in 1999 (on a Monday), 2000, 2003 (on a Friday), and 2004.  (Doc. # 19 Ex. P).  Plaintiff recalls doing this most other years while he was employed at Piper.  (Doc. # 22 Ex. 1 ¶ 6).  Additionally, it is undisputed that Plaintiff had a scheduled vacation day available to him for the day he was terminated.  (*Id.* ¶ 9).  Moncrief testified he did not recall Plaintiff taking off for his birthday over the years but does not dispute that he did so.  (Doc. # 19 Ex. B at 83–84).  Moncrief and Mores did not know if Plaintiff had any vacation days when he was terminated, but they agreed that Plaintiff would not have been terminated if he had gotten approval for a scheduled vacation day for the day he was terminated.  (Doc. # 19 Ex. A at 49; Doc. # 19 Ex. B at 126).

Many employees would schedule vacation days at the beginning of the year, so in January 2005 Plaintiff told Moncrief that he would be taking off for his birthday. (Doc. # 22 Ex. 1).  The

---

conversation in Plaintiff's deposition, (*see* Doc. # 19 Ex. D at 103–104, 106, 109), it did not ask the necessary questions to appropriately limit the deponent's testimony about this subject matter.  One writer has called this "boxing"—the "process of measuring what the witness has said and then building a box around it.  The point is to impose limits so the witness's testimony doesn't improve with age."  *J. McElhaney, Trial Notebook: Basic Deposition Techniques, Litigation,* Vol. 21, No. 1 (Fall 1994).

[3]Almost every year he worked at Piper, Plaintiff claims he took off for his birthday and would sometimes instead take off on a Monday around his birthday so he would have a three-day weekend. (*Id.* ¶ 5).

week before he was terminated, Plaintiff alleges that he reminded Moncrief that he would be off the next Monday for his birthday, and Moncrief said, "OK." (*Id.*). Moncrief denies that Plaintiff sought approval from him to take a scheduled vacation day on August 22, 2005. (Doc. # 19 Ex. B at 141).

### D.   Attendance History of Plaintiff's Alleged Comparators.

Plaintiff asserts that he was treated differently than Caucasian employees who worked for Defendant. More specifically, he compares himself to Phillip Eddy, Caucasian, Carl Minyard, Caucasian, and Ken Downey, Caucasian. Plaintiff worked at Piper with Eddy and Minyard on the first shift of the converting department, and Moncrief was their supervisor. (Doc. # 19 Ex. D at 44, 48; Doc. # 22 Ex. 1 ¶ 4)

The most attendance points Phillip Eddy has received under the Policy is nineteen (19) points, and Eddy still works the first shift in the converting department at Piper. (Doc. # 19 Ex. H; Doc. # 22 Ex. 1 ¶ 4). The most attendance points Carl Minyard has received under the Policy is twenty (20) points. (Doc. # 19 Ex. I). Like Plaintiff, Minyard received a five (5) day suspension when he reached that total. (Doc. # 19 Ex. A at 74–75, 77). After this suspension in Fall 2003, Minyard was transferred to another position at Piper that had a later shift start time. (Doc. # 22 Ex. 2 at 17, 24–25; Doc. # 22 Ex. 1 ¶ 4). While Eddy, Minyard, and Plaintiff worked under Moncrief, Plaintiff personally observed Eddy and Minyard come to work late many times and does not believe any attendance points were given to them on those occasions, though he admits he does not know the circumstances surrounding their absences and whether or not they received attendance points. (Doc. # 19 Ex. D at 110–19). Eddy and Minyard testified that they were not excused attendance points on any occasion. (Doc. # 22 Ex. 2 at 28–30; Doc. # 25 Ex. Q at 28–29).

Ken Downey was terminated on July 18, 2005, for accumulating twenty-one (21) points under the Policy. (Doc. # 19 Ex. B at 73, 74, 156; Doc. # 19 Ex. D at 55, 119; Doc. # 19 Ex. J). Mores made the decision to terminate Downey. (Doc. # 19 Ex. A at 79–80). Unlike Plaintiff, Downey never had twenty (20) points (his attendance total went from 19 to 21), so he was never given a five (5) day suspension and was terminated immediately upon accumulating twenty-one (21) points. (Doc. # 19 Ex. J).

   **E.   Procedural History.**

On July 18, 2003, Plaintiff filed for Chapter 13 bankruptcy protection in the United States Bankruptcy Court for the Northern District of Alabama. (Doc. # 19 Ex. K at 1, 5–6). Plaintiff's Chapter 13 bankruptcy plan was confirmed on December 18, 2003. (Doc. # 19 Ex. K). On September 8, 2005, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission. (Doc. # 19 Ex. L). Plaintiff never amended his bankruptcy papers to include or list his EEOC charge or this lawsuit. (Doc. # 19 Ex. K). On December 1, 2005, the EEOC issued a no-cause determination and issued Plaintiff a Notice of Right to Sue. (Doc. # 19 Ex. M). On December 16, 2006, Plaintiff's bankruptcy case was dismissed. (Doc. # 22 Ex. K at 3, 46). On February 28, 2006, Plaintiff filed this lawsuit. (Doc. # 1).

   **F.   Evidence of Moncrief's Alleged Racial Animus.**

A few months before Plaintiff was terminated, Moncrief's fourteen year old daughter became friends with a fellow African-American student, who asked Moncrief if he could take her out on a date. (Doc. # 19 Ex. B at 85–86; Doc. # 22 Ex. 1 ¶ 5). Moncrief told the student no because he did not want his daughter to date an African-American. (Doc. # 19 Ex. B at 86). Moncrief testified that "as long as my daughter is under my roof . . . I would say that she would not date a black." (*Id.* at

88).  Plaintiff contends that Moncrief's treatment of African-American employees changed after he found out about his daughter's relationship with the African-American classmate.  (Doc. # 19 Ex. D at 143–44; Doc. # 22 Ex. 1 ¶ 5).  After the incident with his daughter, Plaintiff stated that Moncrief hardly ever talked to him and his whole disposition toward Plaintiff changed.  (Doc. # 22 Ex. 1 ¶ 5).

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R .CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson,* 477 U.S. at  248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* at 249.  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

12

The method used by the party moving for summary judgment to discharge its initial burden on the motion depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial. But it does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115–16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or

ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come

forward with additional evidence sufficient to withstand a directed verdict motion at trial based on

the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest

on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343,

358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## IV.   ANALYSIS

### A.   Plaintiff's claims are not barred by judicial estoppel.

Defendant argues that Plaintiff is judicially estopped from asserting the claims in this lawsuit

because he failed to disclose them in his bankruptcy case, which was still pending at the time that

he filed his EEOC charge.  Defendant argues, and Plaintiff does not dispute, that the bankruptcy code

requires a debtor to list all of his assets—including any potential legal claims[4]—when seeking to

have his debts discharged or discounted through bankruptcy.  11 U.S.C. § 521(1).  Defendant has

cited Eleventh Circuit case law for the proposition that the duty to disclose is ongoing throughout

the pendency of the bankruptcy case:

> A debtor seeking shelter under the bankruptcy laws must disclose all assets, or
> potential assets to the bankruptcy court. [citations omitted].  The duty to disclose
> is a continuing one that does not end once the forms are submitted to the bankruptcy
> court; rather, a debtor must amend his financial statements if circumstances change.

*Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1286 (11th Cir. 2002).  Finally, Defendant argues

that the two factors the Eleventh Circuit uses in determining the applicability of judicial

estoppel—inconsistent positions that were made under oath in a prior proceeding and evidence that

---

[4] A plaintiff who failed to list his legal claims as assets in bankruptcy court is barred from thereafter asserting such claims.  *See DeLeon v. Comcar Indus., Inc.*, 321 F.3d 1289 (11th Cir. 2003); *Barger v. City of Cartersville*, 348 F.3d 1289 (11th Cir. 2003).

such inconsistency was calculated (not inadvertent) so as  to make a mockery of the judicial system—are present in this case.  *Burnes*, 291 F.3d at 1285–86.

Both parties agree that there is an ongoing duty to disclose assets that are part of the Chapter 13 Bankruptcy estate, but disagree as to whether or not Plaintiff's claim, which arose after his Chapter 13 Bankruptcy Plan was confirmed,[5] is properly "an asset" of the bankruptcy estate.  The essential question is: have the debtor's post-confirmation assets vested in the debtor or do they

---

[5]Plaintiff filed for Chapter 13 bankruptcy on July 18, 2003.  (Doc. # 19 Ex. K).  Plaintiff's Chapter 13 bankruptcy was confirmed on December 18, 2003.  (*Id.*).  Plaintiff was terminated on August 22, 2005.  He filed an EEOC charge on September 8, 2005 and received his Right to Sue Notice on December 1, 2005.  (Doc. # 19 Exs. L & M).  Plaintiff did not amend his Schedule of Assets and the Statement of Financial Affairs to identify any administrative or legal claims at this time.  (Doc. # 19 Ex. K at 1–4, 12, 27).  Subsequently, Plaintiff fell behind on his repayment obligations under the plan, was declared by the Bankruptcy Trustee to be in "material default," and his petition was dismissed by the court on December 16, 2005.  (Doc. # 19 Ex. K at 45–47).

remain property of the bankruptcy estate until satisfaction of the plan or dismissal of the case?[6]  The

Eleventh Circuit has squarely confronted and decided this issue, albeit in a slightly different context:[7]

> We therefore echo the conclusion of the Seventh Circuit and "read the two sections,
> 1306(a)(2) and 1327(b), to mean simply that while the filing of the petition for
> bankruptcy places all the property of the debtor in the control of the bankruptcy court,
> the plan upon confirmation returns so much of that property to the debtor's control
> as is not necessary to the fulfillment of the plan." *In re Heath*, 115 F.3d [521,]524

---

[6]Whether such post-confirmation assets are property of the bankruptcy estate is muddled
based upon two sections of the U.S. Bankruptcy Code.  According to section 1306:

> (a) Property of the estate includes, in addition to the property specified in section 541
> of this title—
>
> . . .
>
> > (1) all property of the kind specified in such section that the debtor
> > acquires after the commencement of the case but before the case is
> > closed, dismissed, or converted to a case under chapter 7, 11, or 12 of
> > this title, whichever occurs first; and
> >
> > (2) earnings from services performed by the debtor after the
> > commencement of the case but before the case is closed, dismissed,
> > or converted to a case under chapter 7, 11, or 12 of this title,
> > whichever occurs first.
>
> (b) Except as provided in a confirmed plan or order confirming a plan, the debtor
> shall remain in possession of all property of the estate.

11 U.S.C. § 1306 (1999).

A later section of the code provides that "[e]xcept as otherwise provided in the plan or order
confirming the plan, the confirmation of the plan vests all of the property of the estate in the debtor."
11 U.S.C. § 1327(b) (1999).

[7]The Eleventh Circuit, in considering whether or not these provisions, read in conjunction
with the automatic stay provision, 11 U.S.C. § 362(a), provided automatic stay protections to regular
loan payments made by a Chapter 13 debtor outside the plan concluded that this property was vested
in the debtor post-confirmation of his Chapter 13 plan, and, therefore, was not subject to the
protections of the automatic stay. *Telfair v. First Union Mortgage Corp.*, 216 F.3d 1333, 1340 (11th
Cir. 2000).

[(7th Cir. 1997)].  In this case, after confirmation, *only the amount required for the plan payments* remained property of the estate.

*Telfair v. First Union Mortgage Corp.*, 216 F.3d 1333, 1340 (11th Cir. 2000) (emphasis added).  At least three bankruptcy courts have applied the Eleventh Circuit's finding in *Telfair* to conclude that a claim arising after the confirmation of the Chapter 13 plan that is not necessary for the fulfillment of the plan is not property of the bankruptcy estate, vests in the debtor, and, therefore, the debtor is under no duty to disclose such a claim to the bankruptcy court.  *See In re Batten*, 351 B.R. 256, 259 (Bankr. S.D. Ga. 2006); *In re Ross*, 278 B.R. 269, 275 (Bankr. M.D. Ga. 2001); *In re Carter*, 258 B.R. 526, 527–28 (Bankr. S.D. Ga. 2001).[8]  Also, the Eleventh Circuit readopted its *Telfair* holding in an unpublished decision, *Muse v. Accord Human Res., Inc.*, 129 F. App'x 487 (11th Cir. 2005).  Finding that the plaintiff's FLSA claim arose "nearly two years after confirmation [of the plaintiff's Chapter 13 bankruptcy plan]," and that there was "no assertion that those assets were necessary to meet the terms of the bankruptcy plan," the court agreed with the reasoning adopted by the *Ross* and *Carter* courts to find that "the unpaid wage claim was not part of the bankruptcy estate, [the plaintiff] had no duty to disclose it, and [the plaintiff] is not judicially estopped from bringing his unpaid wage claim against the defendants in this case."  *Muse*, 129 F. App'x at 490.

---

[8]Furthermore, although the district court in *Spann v. Dyncorp Tech. Servs., LLC*, 403 F. Supp. 2d 1082 (M.D. Ala. 2005), did not specifically cite to *Telfair*, it concluded that the plaintiff, a former female employee who brought a Title VII action against her former employer, alleging gender discrimination and retaliation, did not have a duty to disclose her post-confirmation claim and did not manipulate courts to gain advantage through inconsistent positions regarding her personal bankruptcy, and thus the action was not barred by judicial estoppel.  *Id.* at 1087.  Some bankruptcy courts have reached seemingly different conclusions.  *See Autos, Inc. v. Gowin*, 330 B.R. 788, 792 (Bankr. D. Kan. 2005) (holding that judicial estoppel could be applied if the plaintiff knew or should have known about her claim by the date her plan was confirmed); *In re Breauxsaus*, 304 B.R. 273, 277–78 (Bankr. N. D. Miss. 2003) (since the plaintiff was clearly aware of his claims pre-confirmation, he was judicially estopped of asserting such claims post-confirmation).

Defendant argues that, unlike the claims in *Ross*, *Carter*, *Batten*, and *Muse*, the Title VII claim asserted by Plaintiff in this case is (or was) "necessary to the fulfillment of the [bankruptcy] plan." (Doc. # 24 at 7). Supporting this proposition, they cite to *In re Harvey*, 356 B.R. 557 (Bankr. S.D. Ga. 2006), which considered *Telfair*, *Muse*, and *Burnes* in addressing the issue this court addresses today. The *Harvey* court found that *Muse* was not binding on it and that *Telfair* was distinguishable on its facts, noting that the *Telfair* court found post-confirmation assets returned to the debtor with the caveat that such assets were not "'necessary to the fulfillment of the plan.'" *Harvey*, 356 B.R. at 563 (quoting *Telfair*, 216 F.3d at 1340) (internal quotation omitted). Instead, the *Harvey* court found neither *Ross*, *Carter*, nor *Muse* persuasive in light of *Burnes*, which it interpreted to require an continuing duty to amend a Chapter 7 petition and Chapter 13 plan. Considering *Burnes*' impact on *Telfair*, the *Harvey* court speculated that the Eleventh Circuit in *Burnes* "could only have concluded that the debtor's schedules must be amended if it believed that post-confirmation causes of action remain estate property." *Id.* at 562. Setting forth its interpretation of what property is "necessary to the fulfillment of the plan," the *Harvey* court continued:

> First, if the plan is delinquent and therefore subject to dismissal, post-confirmation assets may be necessary to fulfill the plan by curing these delinquencies. The answer to the question of what assets are "necessary" in even this narrow circumstance must be subject to judicial determination at any relevant post-confirmation hearing. This prevents vesting from occurring on "auto pilot," but only after notice and a hearing.

> Second, a debtor's post-petition rights and obligations include both the right to seek a modification of a Chapter 13 plan under certain circumstances as well as the obligation to be subject to a post-confirmation modification under certain circumstances. See 11 U.S.C. § 1329(a). Thus, the concept of what is necessary to fulfillment of the "plan" must be understood in the context of a three to five-year period during which there is a "plan." The plan is proposed at the outset, it is then confirmed, perhaps with pre-confirmation modifications, but it also remains subject to post-confirmation modification through Section 1329. Such a modification may be sought by the debtor, Trustee, or a creditor to "increase or reduce" the amount of

payments, and that plan, as modified, becomes the "plan." That plan must satisfy the criteria listed in Section 1325(a), which include the requirements that the plan be proposed in good faith, and that the value of the property that unsecured creditors will receive under the plan is not less than the amount that would be paid in a Chapter 7 liquidation. See 11 U.S.C. §§ 1325(a)(3) and (4).

Properly understood, the *Telfair* qualification that estate property includes whatever may be necessary to the fulfillment of the plan must therefore include not just property existing at the moment of confirmation but post-confirmation property necessary to fulfill a post-confirmation modified "plan," which may require increased payments to meet Section 1325(a)(4)'s Chapter 7 liquidation test and Section 1325(3)'s good faith test at anytime during the three to five-year period after filing.

*Id.* at 563–64. Thus, Defendant argues, as Plaintiff was terminated on August 8, 2005, his cause of action arose on that day.[9] After his termination (and apparently because of his loss in pay), Plaintiff subsequently fell behind on his repayment obligations under the plan, was declared by the Bankruptcy Trustee to be in "material default," and his petition was dismissed by the court on December 16, 2005. (Doc. # 19 Ex. K at 45–47). Because Plaintiff never amended his bankruptcy filings, despite the fact that his plan was confirmed on December 18, 2003, Defendant argues that Plaintiff had a duty to disclose his present Title VII claim because it was "necessary to the fulfillment of the plan."

This court cannot agree with the *Harvey* court's logic or Defendant's arguments for several reasons, but will mention only a few. First, were this court to agree with the *Harvey* court's "potential for plan modification" reasoning, all post-confirmation assets acquired by a debtor would be "necessary to the fulfillment of the plan" to the extent that any Chapter 13 plan could potentially

---

[9]Plaintiff filed an EEOC charge on September 8, 2005 and received his Right to Sue Notice on December 1, 2005. (Doc. # 19 Exs. L & M). Plaintiff filed this lawsuit on February 28, 2006. (Doc. # 1).

be modified, under appropriate circumstances, in the future.  As there was never any modification

(or even any hint at modification) in this case, the court does not find this argument persuasive here.

Second, the court recognizes that what property is "necessary for the fulfillment of the plan"

could be an open question, except that such a determination has already been made by the original

bankruptcy court upon confirmation.  *See* 11 U.S.C. § 1327 (1999); *Telfair*, 216 F.3d at 1340; *In re*

*Heath*, 115, F.3d 521 (7th Cir. 1997).  In fact, the *Harvey* court itself correctly stated that "[a]t

confirmation, the court determines what then-existing property is 'necessary to the fulfillment of the

plan.'"  *Harvey*, 356 B.R. at 563.  Absent the modification scenario detailed by the *Harvey* court

(which can only be initiated by the debtor, creditors, or the trustee—and Piper is admittedly none of

these), logically, this is all that the phrase "necessary to the fulfillment of the plan" means in the

context of confirming a Chapter 13 bankruptcy plan.  Taking this line of argument in conjunction

with the Eleventh Circuit's language of limitation in *Burnes*, upon which *Harvey* primarily relies,

this court thinks it best to take the Eleventh Circuit at its word (even if that word is unpublished),

and follow its holding in *Muse*, which explicitly extends the *Telfair* rule to post-confirmation assets

acquired by the debtor.  *Muse*, 129 F. App'x at 490.

Finding that Plaintiff had no obligation to notify the bankruptcy court of his claim because

the actions giving rise to it occurred post-confirmation, the court agrees with Plaintiff that he is not

judicially estopped from asserting this claim.  When determining which of Plaintiff's assets were

"necessary to the fulfillment" of his Chapter 13 Plan, the bankruptcy court properly took into account

*only* those of Plaintiff's assets existing at confirmation.  Subsequently, no party moved to modify

the plan and thereby allege that the bankruptcy estate as determined in the plan's confirmation was

insufficient to fund the plan.  Under these facts, the court finds that Plaintiff's post-confirmation claim was not subject to disclosure, and, thus, Plaintiff is not judicially estopped in this case.[10]

In the alternative, even if there was a duty to disclose the contingent claim that arose post-confirmation, the court finds that judicial estoppel would be inappropriate in this case because Defendant cannot show that Plaintiff made inconsistent statements in a calculated manner so as "to make a mockery of the judicial system."  *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002); *see also Barger v. City of Cartersville, Ga.*, 348 F.3d 1289, 1294–95 (11th Cir. 2003).[11]  In *Burnes v. Pemco Aeroplex*, the Eleventh Circuit dealt in detail with the issue of when a litigant makes an "intentional contradiction[], not simple error or inadvertence" in his representations to the bankruptcy court and some other court so that judicial estoppel would apply.  291 F.3d at 1286.  Defendant correctly asserts that *Burnes* holds that "deliberate or intentional manipulation [of the judicial system] can be inferred from the record."  *Id.* at 1287.  Quoting the Fifth Circuit, the *Burnes* court concluded that "'the debtor's failure to satisfy its statutory disclosure duty is inadvertent only

---

[10]Defendant has not presented, and the court cannot hypothesize, any basis for Defendant's claim that one of Plaintiff's Chapter 13 creditors or his trustee would have insisted on accelerated payments or taken any other similar action under the plan after learning of his termination and contingent discrimination claims.  It is not lost on the court that the events giving rise to Plaintiff's claims and his alleged duty to disclose them to the bankruptcy court (*i.e.*, his termination) may have also contributed to Plaintiff's material breach of his Chapter 13 repayment plan.  The court does not profess to be a bankruptcy guru, but it seems bizarre to conclude that Plaintiff's creditors would demand more "blood from a turnip" in the situation where Plaintiff had a contingent claim (Plaintiff's lawsuit for employment discrimination) as opposed to a tangible asset (Plaintiff's paycheck that he had been receiving before he was fired).

[11]It is important to note here that "judicial estoppel is an equitable doctrine invoked at a court's discretion."  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal citations and quotations omitted).  Additionally, the Supreme Court has expressly stated that the factors for considering the  propriety of judicial estoppel "do not establish inflexible prerequisites or an exhaustive formula for determining [its] applicability . . . .  Additional considerations may inform the doctrine's application in specific factual contexts."  *Id.* at 751.

when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment.'" *Id.* (quoting *In re Coastal Plains, Inc.*, 179 F.3d 197, 210 (5th Cir. 1999)) (additional internal quotation marks omitted).  Therefore, even assuming Hall had a statutory duty to disclose his Title VII and § 1981 claims (which he did not), the court expressly finds from its review of the record that (1) he did not have knowledge of his Title VII and § 1981 claims prior to his termination on August 22, 2005, more than twenty-one months after the confirmation of his Chapter 13 bankruptcy plan,[12] and (2) that the record fails to reveal a sufficient motive in the form of some benefit to Plaintiff for the concealment of these claims.  Unlike in *Burnes*, where the plaintiff received the benefit of a conversion from his Chapter 13 to a Chapter 7 bankruptcy—a benefit the *Burnes* court expressly noted and relied upon in rendering its decision—Plaintiff did not receive any tangible benefit in this case.[13]  Plaintiff did not derive a benefit from such alleged

---

[12]Plaintiff was terminated on August 22, 2005, filed an EEOC charge on September 8, 2005 and received his Right to Sue Notice on December 1, 2005.  (Doc. # 19 Exs. L & M).  Plaintiff subsequently fell behind on his repayment obligations under the plan, was declared by the Bankruptcy Trustee to be in "material default," and his petition was dismissed by the court on December 16, 2005.  (Doc. # 19 Ex. K at 45–47).  Even if the court were to agree with Defendant's arguments here, it questions whether Plaintiff had a reasonable amount of time in which to confer with his bankruptcy attorney, determine the value of his claim, and update his bankruptcy filings before the dismissal of his petition.

[13]Again, Defendant argues that the "benefit" to Plaintiff is the ultimate value of this case to Plaintiff in the form of any monetary compensation, since his creditors and/or the trustee of his bankruptcy estate will not have had any "opportunity to seek a modification, to cure Plaintiff's delinquency [in his Chapter 13 payments] and to more fully protect his creditors."  (Doc. # 24 at 9). Considering that Plaintiff appeared to be in material default of his Chapter 13 payments by at least November 1, 2005 when the Chapter 13 Trustee filed his motion to dismiss on the grounds that Plaintiff had so defaulted, and taking this into consideration with the fact that Plaintiff was not terminated until August 22, 2005, did not file an EEOC charge until September 8, 2005, and did not receive his Right to Sue Notice until December 1, 2005, the court finds any benefit to the creditors or the bankruptcy estate during this three month period in which Plaintiff arguably had this contingent court claim to be negligible at best.  (Doc. # 19 Exs. K, L & M).  Moreover, since his bankruptcy petition was dismissed, his debts were not discharged, and any one of his creditors can

Case 2:06-cv-00393-RDP   Document 27   Filed 06/14/07   Page 23 of 27

concealment while his bankruptcy was pending, nor from its dismissal as his debts were not discharged. *See Spann v. DynCorp Tech. Servs., LLC*, 403 F. Supp. 2d 1082, 1087–90 (M. D. Ala. 2005) (holding that plaintiff who failed to disclose her post-confirmation claims that arose two years after confirmation  and whose bankruptcy was subsequently dismissed did not receive any benefit from her alleged intentional non-disclosure (other than the automatic stay, which she would have received in any event by filing a bankruptcy petition) because her payments were not lowered during the bankruptcy's pendency and her debts were not ultimately discharged).[14]  Here, as Plaintiff's claims were post-confirmation and thus not part of the bankruptcy estate, Plaintiff's contingent discrimination claims (as with his other assets outside the plan) are not even entitled to the protection of the automatic stay. *Telfair v. First Union Mortgage Corp.*, 216 F.3d 1333, 1340 (11th Cir. 2000). Therefore, the court finds there is insufficient evidence in the record from which to infer Hall's "intentional manipulation" of the judicial system so as to establish the prerequisite intent for the application of judicial estoppel to Plaintiff's claims.[15]

---

pursue a myriad of debt collection strategies should Plaintiff recover in this case.

[14]In *Spann*, the Honorable Myron Thompson also discussed the primary case cited in *Burnes*, *In re Coastal Plains*, 179 F.3d 197 (5th Cir. 1999), and distinguished it from the situation in his case (which is identical to the situation in the case presently before the court).

[15]At least one court has concluded that judicial estoppel should not be applied in a case that is, procedurally, very similar to this one. *Woodward v. Taco Bueno Rests., Inc.*, Civ. Action No. 4:05-CV-804-Y, slip op., 2006 WL 3542693 (N.D. Tex. Dec. 8, 2006). There, the plaintiff's claims arose a substantial amount of time after his Chapter 13 Plan had been confirmed.  In addition, the court noted the uncertainty of the law in the Fifth Circuit "as to the status of assets acquired by a debtor after the confirmation of his Chapter 13 Bankruptcy Plan and as to the duty of that debtor to disclose those belatedly acquired assets."  Specifically, the court found:

> [I]n cases such as this, an exception must also be made where the law is unclear and unsettled.  To impose judicial estoppel against one whose duty is unclear would violate a fundamental principle in our jurisprudence: people are entitled to fair notice

23

**B.**     **Genuine issues of material fact preclude summary judgment for Defendant.**

The court, after carefully reviewing the record, finds that there are material issues of fact that require decision by the trier of fact. The court will not discuss every material factual dispute evidenced in the record, but will instead highlight only a few in order to address Defendant's summary judgment arguments. First, the court finds that a reasonable trier of fact could conclude that Plaintiff was replaced by a person outside his protected class.[16] *See Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1290 (11th Cir. 1998) (laying out the elements to establish a *prima facie case* of discriminatory discharge, stating that the plaintiff must show that: (1) that he is a member of a protected class; (2) he was qualified for his job; (3) he was discharged; and (4) his former position was filled by a person outside his protected class.). Alternatively, Plaintiff could also make a showing that he himself did not violate the work rule. *Damon v. Fleming Supermarkets of Fla., Inc.*,196 F.3d 1354, 1360 (11th Cir. 1999), cert. denied, 529 U.S. 1109 (2000) ("On summary judgment, we have written that the 'work rule' defense is arguably pretextual when a plaintiff

---

of what the law is before being held accountable under it. *See* U.S. CONST. Amend. V. Although our jurisprudence does not require actual knowledge of the law in order to be held accountable under it, even a just application of the notion of constructive knowledge relies on the law's being clear and having been published to the public. Here, neither is the case. The law is not clear and because it is not clear, it has not been made known to the public.

*Id.* at *11. Obviously, that decision was not referring to the lack of clarity in Eleventh Circuit law. However, after a review of our circuit's law on the same issue, this court finds Eleventh Circuit law equally unsettled, and therefore the above-described notice argument is equally applicable. The court also notes that *Burnes*—one of the (if not *the*) primary cases cited in support of judicial estoppel in the Eleventh Circuit—relies heavily on the Fifth Circuit case of *In re Coastal Plains*, 179 F.3d 197 (5th Cir. 1999). *In re Coastal Plains* is one of the leading cases on the issue in that circuit and provides much of the foundation for the Eleventh Circuit's jurisprudence in this area.

[16]In fact, Defendant does not dispute that Hall was replaced by a Caucasian employee, and instead relies on its pretext argument in this regard. (Doc. # 22 Ex. 3).

24

submits evidence (1) that she did not violate the cited work rule, or (2) that if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated."); *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989) ("Accordingly, we hold that, in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct."). Thus, Plaintiff need put forth valid comparators only if he sees the 'work rule' formulation of the *prima facie* case.[17] Based upon all the evidence submitted, a reasonable fact-finder could conclude that Plaintiff had, in fact, scheduled a vacation day on August 22, 2005, that his supervisor knew it, but terminated his

---

[17]It is unnecessary for the court to reach Defendant's arguments regarding the dissimilarities between Plaintiff and his alleged comparators. However, in response to Defendant's insistence that there is only one way for Plaintiff to make out his *prima facie* case of discrimination—by showing that similarly situated employees outside the protected class were treated more favorably under the Attendance Policy than he was (Doc. # 18 at p. 14)—the court would underscore the Eleventh Circuit's decisions in this area, which clearly declares that the *prima facie* showing for discrimination cases can be flexible. Indeed, the Eleventh Circuit has "repeatedly emphasized that the requisite showings that make up a *prima facie* case are not meant to be rigid or inflexible." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999). As the Supreme Court reiterated in *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983), "the *prima facie* case method established in *McDonnell Douglas* was 'never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Aikens*, 460 U.S. at 715 (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 575–77 (1978), which noted that "[t]he facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from respondent [in that case] is not necessarily applicable in every respect to differing factual situations."). Thus, the methods of presenting a *prima facie* case, as well as the exact elements of the case, are flexible and depend to a large degree upon the facts of the particular situation. *See, e.g.*, *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984); *Lincoln v. Bd. of Regents of Univ. Sys.*, 697 F.2d 928, 937 (11th Cir. 1983).

employment in any event.[18]   Furthermore, a reasonable fact-finder could determine that Eddy and

Minyard engaged in similar misconduct and yet were treated differently by Piper.  These issues will

require that credibility determinations be made by the trier of fact as between Plaintiff and Moncrief.

Additionally, the court finds that Plaintiff has put forth sufficient evidence of pretext such

that a reasonable trier of fact could conclude that Defendant's stated reason for Plaintiff's

termination—his violation of the Attendance Policy—was pretextual.  Plaintiff can establish pretext

"either directly by persuading the court that a discriminatory reason more likely motivated the

employer or indirectly by showing that the employer's proffered explanation is unworthy of

credence."  *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)

(quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).  Plaintiff has presented

evidence that he had scheduled a vacation day in advance with Moncrief.  The parties have made

conflicting assertions about who truly oversaw, recorded, and determined the category for Plaintiff's

absences—Mores or Moncrief.[19]   Finally, Moncrief has admitted racial animus at least toward

---

[18]Thus, it will also be for the trier of fact to decide if Defendant believed in good faith that
Plaintiff violated the work rule.

[19]In fact, even if the fact-finder (or the court, at trial, on appropriate motion) were to find that
Moncrief was not the actual decision-maker, he could still be considered the *de facto* decision-maker
under "cat's paw" jurisprudence recognized by the Eleventh Circuit, on the theory that he made a
false report to Mores, which was not independently investigated by Mores, that Hall had violated
Piper's Attendance Policy, and that this is what caused Plaintiff's termination.  *See Wright v.
Southland Corp.*, 187 F.3d 1287, 1304, n. 20 (11th Cir. 1999); *Stimpson v. City of Tuscaloosa*, 186
F.3d 1328, 1331 (11th Cir. 1999) ("We have previously stated the general proposition that in some
cases, a discharge recommendation by a party with no power to actually discharge the employee may
be actionable if the plaintiff proves that the recommendation directly resulted in the employee's
discharge."); *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998);
*Schoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999) ("Although Boyd was not the final
decision maker, he was an integral part of the multi-level hiring process that had been established
by the Department of Interior's Fish and Wildlife Service."); *Olmsted v. Taco Bell Corp.*, 141 F.3d
1457, 1461 (11th Cir. 1998).

interracial relationships and Plaintiff has asserted that Moncrief's prior experiences and problems in that area affected his treatment of Plaintiff.[20]  These issues are for resolution at trial, not Rule 56 disposition.

**V.      CONCLUSION**

For the reasons stated above, the court finds Defendant's Motion for Summary Judgment is due to be denied, because Plaintiff's claims are not barred by judicial estoppel and the existence of genuine issues of material fact precludes judgment for Defendant as a matter of law.  The court will enter a separate order in accordance with this memorandum opinion.

**DONE** and **ORDERED** this _____14th_____ day of June, 2007.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[20] The court does not express any opinion regarding whether the mere fact that a supervisor disapproves of interracial dating would be enough to suggest pretext related to decisions made in the workplace.  Here, Plaintiff has presented evidence that, if believed by the jury, could link those views with treatment of Plaintiff at work.